Good morning, may it please the court. My name is Terry Ryan. I represent Marilee Holt. I was not trial counsel. I was appointed by the court to do the appeal in this case. I have five issues in my brief. I'm going to speak on the blood draw issues to some extent and not so much on the remaining issues. The first issue with regard to the blood draw is whether or not the blood draw at the hospital was voluntary. I believe that's what the trial court found, was that since the defendant signed the hospital consent form for blood draw, that that then made the blood draw consensual and voluntary. My argument is that that's not the case. At that point, the defendant had been arrested at the Travel Casino. She was then taken to a law enforcement building. She was then arrested and cuffed and taken to the hospital. So at that point when she's at the... She was given her Miranda rights too, wasn't she? Didn't they give her Miranda rights at some point? I believe they had, yes. And she said, I don't want to talk. I don't want to talk. I don't want to talk. And I don't want to... And when they got to the hospital and after they did the examination of her, you know, to make sure she hadn't been injured in any way, and then they asked for the blood draw, and the officer said, she's not going to agree to that. Right. She's not going to agree to that. Right. And she says, take my blood. It sounds like everything was very cordial at that point. What gives? She's still in custody. Yeah, no question. And I think at that point the cuffs are now off. I don't know whether they were metal cuffs. I think they just take them off to do the exam. To do the exam. But the cuffs are off, but she's still in custody. And there's an officer, I don't know whether he's in the room or in the area. He's saying she's not going to agree. Right. He's not going to agree to have her blood drawn. He's saying that to the nurse that's going to take the blood. And then she says, yes, I am. I'll sign that. I'll sign that. And she does. What do we make of that? What do I make of that? What do we make of that? That it's not consensual. What tells us that it's not consensual? What tells you that? Yes. That she's in custody. That's it? That's it. That's all I've got. She's in custody. Yeah. Okay. Second issue is the question of whether the court should have allowed the blood evidence in. Let me ask you another question with respect to the taking of the blood. Why doesn't Schmerber allow what was happened, you know, support what happened here? I think that's... It was probable cause. Well, that's the question. Do you think there was probable cause? My argument is that there was not probable cause. Why do you... What do you base that on? I base that on the whole circumstance. There was obviously a collision between a human being and a van being driven by somebody. The police at that point felt that my client was driving the van because... Hadn't they pretty much... They had some pretty good evidence that she had been driving that van. They had evidence that the van belonged to her. She said she wasn't driving it. But they discounted that argument that some fat guy was driving the van. The van had damage to the front, damage to the window. It had the victim's hair embedded in the glass, although they didn't know that at the time during the investigation. But they had some evidence that perhaps Marilee Holt was driving that van. Why doesn't that sort of add up to probable cause? Well, it may. My argument is that it does not. If it adds up to probable cause... If it does... That's two hours after the accident, and everybody sort of knows that one's blood alcohol level decreases over time. Well, it also increases over time. Well, this had been two hours. Correct. So they wanted to get that blood draw as soon as possible. Yes, and the trial court... Why doesn't that all add up to probable cause plus an urgency, which equals exigent circumstances, which under Schmerber allows what they did, without even getting to voluntariness? Well, assuming that the court feels that there was probable cause, then that fairly well extinguishes my argument at this point. But my argument is that there was not probable cause. Fair enough. The taking of the blood alcohol, the taking of the blood, was, as the trial court said, two hours and 20 minutes after the collision. And they fixed the time of the collision based upon the evidence gathered at the scene from witnesses, etc. But that's approximately how long the draw was after the collision. So then the question becomes, should the trial court have excluded the blood draw evidence because it was so long afterward? And I've done a few DUIs, and over the years I've learned that when you go into a bar and you have a couple of quick shots of whatever it is, your blood alcohol level doesn't start going up right away. It takes several minutes, perhaps even a half an hour to an hour, before it starts increasing your blood alcohol level. So my argument is that when the forensic expert testifies that Marilee Holt's blood alcohol level two hours and 20 minutes after the accident was 0.15, that there's no connection between that testimony and what her blood alcohol level was if she were the person driving that van, and what her blood alcohol level was at the time of the collision two hours and 20 minutes before that. Was it going up? Was it going down? Had she popped a couple of beers? She said she popped six. Her testimony was that she had had six beers at the club, and then the evidence in the casino indicated that she didn't drink in the casino at all. Correct. And when she went to the casino, the videotape indicated she went in singly and then came out. Right. So, wow. I agree that there is no evidence that after the collision she imbibed. She had no alcohol, as far as we know. I agree with that testimony, that when she got to the casino, something hit her van, according to what she said, and she was in the casino, the cameras were on, they watched her going from the car into the casino and inside the casino. But the tavern owner, and I think the tavern was called PK's, I'm not familiar with Lapway Idaho, but I think it's PK's, and the person that was serving there said she may have had one beer. And I'm not certain that she said she had six, that may be part of the record. My recollection is that she said she had some beers there at PK's, which is inconsistent with what the bartender said she had inside PK's. Also, if you take a look at some of the pictures that were admitted into evidence, there are some beer cans in the van, and I don't know how they impact this case at all. The point I'm trying to make is that we really don't know when Merrilee Holt ingested alcohol. So my argument is that the trial court, because the trial court allowed the jury to speculate on why this blood alcohol evidence is being admitted, should not have admitted that evidence. Juries should never be allowed to speculate. What difference did it make when she consumed the alcohol if you have the blood alcohol test? Why is it critical to know exactly when she consumed the alcohol? Because if she consumed the alcohol five minutes before she got in the van, then got in the van, I think it's fairly certain that she would not have been affected by the alcohol at the point of the collision. With regard to my assignment of error number three, the defense argued that the defendant was not guilty of this crime because she was not committing a crime with knowledge or with impunity. In other words, she got in her van, she was driving, and all of a sudden something was hit in the roadway, according to what she knew. Obviously, there was an individual that was hit in the roadway. That individual, according to the testimony of the experts, that individual was running across the roadway from the store, going to the northbound, from the southbound portion to the northbound portion of the roadway, and therefore ran across the front of the van and got hit by the right or passenger side of the van. That's not the way I see the evidence. The way I see the evidence, the victim, Mr. Briner, came from the right side of the roadway, stepped into the van and was hit and hurled many feet to the north and east of the traveled portion of the roadway. What did the jury, I mean, how do you think the jury saw the evidence? I think the jury might have been a bit confused by the forensic expert who said that Mr. Briner was running from or walking from the west side, going across the southbound lane into the northbound lane and then got hit. I think the forensic expert said that because there was some testimony from the individual that was sweeping with the machine the parking lot of the supermarket and saw Mr. Briner going in that direction. But there's a disconnect there as to how Mr. Briner got to the position where he was hit by the van. My theory is that he walked across the roadway as he apparently had done prior to being hit by the van earlier that evening and that he was then coming back, perhaps to go back to Peake Case. I don't know. Counsel, there was no Rule 29 motion made at the close of the government's case, was there? I believe there was. I'm not certain. I didn't see that that was done. But if there was no Rule 29 motion made, then we're under plain errors, right? Is that right? I'm sorry. I missed that. If there was no Rule 29 motion made, are we reviewing for plain error? I believe we are, yes. One of the things that the government needs to prove in order to convict Ms. Holt is that the death of Mr. Briner was either as the result of a quarrel or in the commission of an unlawful act or in the commission of a lawful act without caution and circumspection. Those were the elements that were given to the jury, that the jury was instructed in. And if you take a look at the whole record in this case, there is nothing which would indicate what Merrilee Holt did which may have been unlawful or which may have been without caution or without circumspection. What we know from the evidence is that she had been at P.K.'s. We know that the bartender said she had one beer. We know she said she had, according to the court, six. I recall the same thing as Ms. Jenkins, that she testified that she had six. Now, I may be wrong about that, but I have this recollection. Yeah, I don't have a particular recollection. But we don't know over what period of time. We don't know how much before the collision. And so the government didn't prove why the collision happened. They didn't prove that Merrilee Holt caused the collision by some unlawful inaction on her part. So I think that in that respect, the government failed to prove its case. And then my last issue is something that I think the court would or should consider in the event that the court decides that there was a reversible error in this case and the court is going to send this matter back to the trial court either for a new trial or resentencing because the trial court judge did not review or mention the 3553A standards in this case, and I think the court should have done that. In what respect do you say the court did not consider the standards? And how is there any error if she was sentenced to the low end of the guideline range? Well, that's why I say in the event that the court determines that resentencing is necessary in this case or a new trial, since the defendant was sentenced to the low end of 41 months, my argument regarding the 3553 is at this point academic. Okay. Thank you. Good morning, Your Honor. My name is Nancy Cook. I am the prosecutor from Coeur d'Alene, Idaho, who tried this case. Let me answer a couple of questions the court had during counsel's argument. First of all, the defendant admitted to six beers at the time she was at the police station before she was placed under arrest. Where is that in the record? I don't have the page number, Your Honor, with me, but it is in the testimony of Douglas Hart, the special agent in the case. It would be both in the motion to suppress and at the trial testimony. Also, there was further testimony regarding Ms. Holt's state when she walked into PK's bar, that she was unsteady on her feet. Officer Bergeau testified at the time he saw her enter that she was unsteady on her feet as she walked from her van into PK's bar. He further testified that he did not see any fat white guy there at the bar, which is on the Nez Perce Indian Reservation. And there was further testimony regarding the fact that if someone was a stranger there on the reservation, that the officers who patrol the area, it's a very small area, would note the fact that there was a stranger in the area as they had noted the victim in this case. And you will also recall the testimony of Officer Bergeau was that he saw the defendant enter into PK's approximately an hour to an hour and a half prior to the accident, so we do know and have a time frame as to when she had those six beers. Regarding the testimony of PK's owner, I can't recall her name at this time, at the end of her testimony during cross-examination, she admitted that she had liability for serving someone who was already intoxicated. I felt that the jury viewed that and took that into consideration when viewing her testimony, that she admitted knowing that she had liability for serving someone who was intoxicated. Also, the court asked the question regarding the fact that the defendant invoked her rights. She did not invoke her rights there at the police station. When asked whether or not she would take a breathalyzer after she was placed under arrest, actually, she was asked whether or not she would take a breathalyzer before she was placed under arrest. She said, no, you're not going to trick me, I watch Lifetime TV. After that point, the nod was given to Officer Strodnik, and he placed her under arrest for manslaughter and obstruction and resisting arrest. At that point, she was given Miranda, which is through the officers, the tribal rules, which are very similar, I believe they're denoted specifically in the brief. There were no further questions made at that point. Didn't she say, I'm not going to talk or something? No, she didn't say anything because no questions were asked. She was told at that point that she was going to the hospital and blood would be drawn. Let me see. If I could, I would just go through the arguments as they were and note the circumstances as the government sees them. First of all, the defendant did give a voluntary consent. There is no doubt about that looking at the totality of the circumstances. The defendant was in custody. There's no doubt about that. There were no guns drawn. There's no evidence of undue police influence in the room at the time the blood draw kit was taken out, that the phlebotomist, Miss Otto, opened the kit and pulled out the consent. Special Agent Hart said she's not going to sign it, and she just says, yes, I will. The form itself has an implied consent, excuse me, has the implied denial of the consent. You have a right to give consent. So it has what? Say that again. She can deny consent. By the way, the form is written in such a way, and I wish I had brought it with me, the exhibit itself, that shows that you have the right to consent or not to the taking of the draw. It says I grant permission for samples of my blood to be taken. Yes, that she can grant it or not. It doesn't say there's no forcible language that you must consent, that there's any ramifications if you don't consent. There was no threat that a search warrant would have been obtained, but it was clear that the officer was going to take her blood. If you discount the fact that she gave a valid consent, clearly there was probable cause and exigent circumstances, as the court has noted, from, and I'm going to mispronounce it, Schmerber, taking into consideration all those factors that were brought forth through the motion to suppress hearing as delineated in Judge Lodge's order, it clearly established probable cause and exigent circumstances. The court's denial of the defendant makes complaints to exclude the blood draw evidence. First of all, the defendant, the government did not introduce at trial any retrograde extrapolation, so that issue is really. What was the purpose of it? The reason I didn't introduce it. No, what was the purpose for introducing it? Would have been, if I had introduced it, I didn't introduce it. That was just brought up in the motion to suppress. That was the pretrial motion during the trial. At trial, wasn't the blood alcohol bubble introduced? Yes, but there was no testimony about retrograde extrapolation to try to determine the exact amount. I'm not suggesting that there was. My question, I just jumped ahead, I guess. Yes. Your Honor, the reason it was introduced was to collaborate all the other testimony regarding the status of Ms. Holt at the time she drove her motor vehicle down the highway and killed Mr. Briner. We had much testimony regarding her physical state at the time she was at PK's. We have her admission of six years. Further, we have her later telling her daughter she had just hit something. It sounds like what you're arguing it for is to show that she was under the influence at the time she was driving the vehicle. Yes, Your Honor, and I looked at the cases that I cited and tried to figure out how long it was after the alleged accidents that the blood draws were. It seemed to be an average of almost two hours between the time of the accident and time of the blood draw. It seems reasonable based upon looking at the facts of any case. You're going to have an investigation. You have to make a determination. In this case, there had to be an investigation to see who in fact was driving the vehicle. You can't just go and order a blood draw of someone without probable cause, and I think that it was fairly reasonable that it would take that long. Ms. Holt had an opportunity to take a test immediately thereafter, relatively within a short period of time, and that was a breathalyzer. Counsel, in your brief on page 9, you said that Agent Hart asked Holt if she had been drinking, and Holt said she had had six beers, and you cite ER 369 and 370 for that proposition. I'm trying to find that in the record. Do you have your record? I do not have it, Your Honor. I apologize. I looked at pages 369 and 370 of the record, and I do not see that as a reference. I will find it if the Court would like me to supplement that if I made an error in citing it. I would like you to have it for oral argument. I apologize. Counsel did not address the denial of Starr's testimony, but he did raise that on appeal. The Court took that under deliberation during the presentation of the government's case, and it was only after several witnesses had testified that the Court made a denial of Mr. Starr's testimony. The situation was such that he may have been a qualified expert. The government did not have much information on Dr. Starr. We don't know whether or not he would have testified that would have been in any way relevant in the sense of the victim, Mr. Briner's, history because of the fact that we were never supplied any information. Clearly, it wasn't a proper subject matter because of the fact it had been at least eight or nine months prior to the accident that he had last seen Mr. Briner, and there would have been no probative value. It would have just had a presidential effect to bring forth the fact that at some time in his past, he had a problem with drugs and had thought about committing suicide. So the Court properly denied the ability for the defendant to bring forth that expert. Sufficiency of evidence. The government and the defendant entered into a stipulation that the defendant, in fact, was an Indian. And counsel brought forth the fact that we did not show she was involved in committing an unlawful act, but I think the totality of the circumstances, the evidence presented that she was operating a motor vehicle in violation of the law, that she was drunk while driving, and that she was, in fact, the proximate cause. She had been an Indian for a while. Right, Your Honor. There's a difference. I used that term too loosely. I apologize. That's correct. And that she should have known, common knowledge is when you're driving a motor vehicle while under the influence of alcohol, that you are threatening the lives of others because you're under the influence. And as I believe the testimony of Trooper Rouse was that you're dulled down, your senses, you don't react as quickly as possible. And there was much testimony about the fact that it was on the Nez Perce Indian Reservation. In regards to her driving, we had the fact that on the tape at the casino that she was the only one who exited a vehicle. It was, in fact, a van registered to her, that her key was in her pocket at the time she was arrested, and that she had admitted to her daughter that she had hit something, that she clearly, the evidence showed, she had driven from P.K.'s Bar, which is south of the casino, which while she was driving would have gone through the area where Mr. Briner was killed. Which time of the day was it? I can't remember. I believe the accident occurred at 1 a.m. It was dark. Yes, but there was much testimony about the fact that there was ambulant light and that… Where the collision occurred? Yes, there was lighting from Valley Food Store, and there was also intermittent light from a grain elevator that was there on the side of the road. An initial story was that the car wasn't driven by her at all, but it was driven by a fat man. Right. The fact that her testimony, when she was asked about that, it changed. At first she said she gave him a ride. Then she said he drove. Then she said he bailed out. When asked where he bailed out, I don't know. None of that made any sense. Clearly, the jury did not find her statements credible on that issue, and there was nothing to substantiate that. She admitted to the six beers at P.K.'s and that she was unsteady on her feet prior to walking in there, that she was at the P.K.'s bar after the victim had left. There was much testimony regarding what he was doing after he left. One of the officers saw him doing karate moves and acting silly across the street. We had another officer who saw him walking, a matter of factly, down the road, trying to get to Highway 95, which would have been the road that would have taken him home. We had the testimony of the driver of the cleaning vehicle, who stated that he walked, matter of factly, over to the phone, and the Coke machine looked for money. He lost sight of him as he started walking north. The defense brought forth their theory that the victim ran back and forth on the highway. None of that testimony was believed by the jury because of the fact that none of the witnesses could testify that that, in fact, was the victim, nor was there any police report showing that there had been any complaints of someone running back and forth across the street to show that he was, in fact, the proximate cause. Also, the evidence at the scene showed that there was no evasive measures made by the defendant when she was driving to try to avoid any collision with the victim. The last argument brought forth by the defendant was that the court failed to consider the 1835-53 factors. That is not what appears in the record. The judge, Lodge, clearly considered those factors in her testimony. He spoke specifically about good and bad judgment, that she considered the good things she had done in her life. He clearly states in the record he's going to impose a sentence that is sufficient but not greater than necessary. He wanted to have a just punishment that was also a deterrent. Clearly, the district court judge took into consideration all those factors. Thank you very much. Your Honor, opposing counsel didn't recollect whether or not a Rule 29 motion was made at the close of the government's case. Do you recall? There was no Rule 29 made at the close of the government's case or at the close of the trial. Do you have a little bit of time left for rebuttal? No, maybe not. I'll give you a minute. I don't need a minute, Your Honor. Your Honor, I just wanted to indicate where in my brief I talk about how many beers the defendant had. On page 8 of my brief, I'm talking about the testimony of Corporal Strybeck, and she advised Corporal Strybeck she had some beers. And then on the next page, page 9, she's now talking to FBI agent Hart, and she said she had been drinking beer. If, in fact, her testimony was that she had six beers, I frankly don't recollect. It is there. It's in Strybeck's brief. Thank you, Your Honor. Thank you. Thank you, counsel. The matter is submitted. We have one final case for argument this morning, United States v. Crow.
judges: Paez, Rawlinson, Jenkins